# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **THERESA LYNN MIDDLETON,** | ) | |
| | ) | **No. 13 CV 4483** |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,** | ) | |
| | ) | **November 9, 2015** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION and ORDER

Theresa Middleton applied for disability insurance benefits ("DIB"), *see* 42 U.S.C. §§ 416(i), 423, based on her claim that a combination of her cervical stenosis with sciatica, degenerative disc disease of the lumber spine, status post cervical fusion, coronary artery disease, swollen legs, and obesity renders her completely disabled. After an administrative law judge ("ALJ") denied her application and the Appeals Council declined her request for review, Middleton filed the current lawsuit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Middleton's motion is granted and the Commissioner's is denied:

## Procedural History

Middleton applied for DIB on January 13, 2010, claiming that she became unable to work on December 26, 2008. (Administrative Record ("A.R.") 18, 184.) After her claims were denied initially and upon reconsideration, (id. at 86-91, 95-

98), Middleton sought and was granted a hearing before an ALJ, (id. at 101-06, 151-52).  The ALJ held a hearing on October 11, 2011, at which both Middleton and a vocational expert ("VE") testified.  (Id. at 53-84.)  On October 31, 2011, the ALJ issued a decision finding that Middleton was not disabled within the meaning of the Social Security Act and denied her claim for benefits.  (Id. at 18-29.)  When the Appeals Council denied Middleton's request for review, (id. at 1-6), the ALJ's decision became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013).  Middleton filed this suit seeking judicial review, (R. 1); *see* 42 U.S.C. § 405(g), and the parties consented to the jurisdiction of this court, (R. 6); *see* 28 U.S.C. § 636(c).

## Facts

Middleton's claim of lower back pain dates back to the early 2000's. (A.R. 397.)  She also reported upper back and neck pains in 2004 for which she underwent two surgical procedures: a C4-C7 cervical spine fusion in 2004 and a C3-C4 cervical spine fusion in 2006.  (Id. at 376, 397.)  Despite the pair of surgeries Middleton continued to experience neck and back problems which, according to her, have gradually worsened over time.  (Id. at 292-95.)  To relieve her pain she sought treatment including physical therapy, medications, diagnostic testing and evaluations, and steroid epidural injections ("ESIs").  (Id. at 58-59, 292-95, 479, 482.)  According to Middleton, none of these has provided relief.  Because of her ongoing pain, Middleton stopped working as a customer service representative in a retail store sometime in October or November 2008, when she was 48 years old.  (Id.

at 57, 65, 176, 184, 188, 212.)  At her October 2011 hearing before an ALJ, Middleton presented both documentary and testimonial evidence in support of her DIB claim.

## A.  Medical Evidence

The medical records tracing Middleton's back and neck issues describe a series of cervical fusion surgeries and post-surgery examinations to evaluate the condition of her cervical and lumbar spines.  The records indicate that Middleton has been complaining of lower back and neck pains as early as 2000.  (Id. at 376, 397.)  To better diagnose and treat her symptoms, Middleton's primary care physician, Dr. Jose Penaherrera, referred her to neurosurgery specialist Dr. Thomas Hurley in 2004.  (Id. at 192, 436.)  After identifying various ventricle epidural defects present in Middleton's cervical spine in connection with central canal stenosis and degenerative disc disease, (id. at 438-39), Dr. Hurley performed a C4-C7 cervical spine fusion surgery in 2004.  (Id. at 376, 397, 407, 438-39.)

In May 2005 Dr. Hurley reviewed an MRI report of Middleton's cervical spine and observed that spinal stenosis appeared to have "resolved" and that the spinal alignment was "good."  (Id. at 424, 429.)  In the fall of 2004 and 2005, Dr. Penaherrera followed up with x-rays and confirmed that Middleton's cervical fusion appeared "stable" and that her vertebrae were in "good alignment."  (Id. at 409-10.)  But when Dr. Hurley noted a moderate-sized extradural defect compressing the ventral aspect of the cervical spinal canal at C3-C4, "moderate central spinal stenosis" at both C3-C4 and C5-C6 secondary to disc, and osteophyte

complex on a CT cervical myelogram in February 2006, Dr. Hurley recommended a second fusion surgery, this time at C3-C4.  (Id. at 419-23.)

After the second surgery, Dr. Hurley ordered post-operative MRI and x-ray reports in July 2006 to reassess Middleton's cervical spine and generally found normal height and alignment of the vertebral bodies.  (Id. at 417-18.)  The findings also indicated, however, prevertebral soft tissue swelling and the possibility of hematoma in addition to some foraminal narrowing at C6-C7 on the left.  (Id. at 407-08, 417.)  Two months later, Dr. Penaherrera followed up with another diagnostic imaging on Middleton's cervical spine and found the fusion plate and screws in good position and no signs of loosening.  But the findings also included abnormal straightening of the cervical spine.  (Id. at 406.)

The record indicates that Middleton continued to complain of pain and underwent a series of diagnostic tests, evaluations, therapies, and treatments from late 2008 to the date of her hearing before the ALJ.  The diagnostic findings with respect to her cervical spine were varied.  In March 2009 Middleton complained of bilateral arm numbness and tingling, which prompted Dr. Amy Weierman to order cervical spine CT images.  The images showed that the cervical spine was within normal limits without evidence of fracture or extradural defects.  (Id. at 404.)  The report also indicated, however, a mild osteophyte protruding to the right paracentral region as well as a mild degenerative change in the spine.  (Id.)  Evaluations from late 2009 and early 2010 were generally "unremarkable" with "satisfactory" cervical alignment and "stable appearing" anterior fusion at C3-C4.

(Id. at 278-83, 403.) The findings also noted "mild" levels of degenerative change, osteophyte, indentation of the cervical cord, and central canal narrowing. (Id. at 258, 299, 403-04, 415.) The diagnostic findings also included bilateral uncovertebral hypertrophy with mild central canal narrowing at C4-C5, right paracentral disc osteophyte complex with mild indentation of the cervical cord at C5-C6, and left uncovertebral hypertrophy causing mild to moderate left neuroforaminal narrowing at C6-C7. (Id. at 258, 415-16.) Based on these findings, Dr. Hurley opined in January 2010 that Middleton had a "complete temporary disability." (Id. at 276-77.)

From 2006 to 2011, Middleton also had a series of CT scans, MRIs, and x-rays of her lumbar spine and hips to investigate her complaints of lower back pain. (Id. at 259-60, 273-74, 297-98, 411-14, 475, 479, 419-23, 479-82.) Physicians described the diagnostic findings for the lumbar spine as "unremarkable," "stable," "mild," "minimal" with satisfactory alignment, normal vertebral body heights, and "no significant central canal or neural foraminal stenosis." (Id. at 259-60, 273-74, 411-12, 480-81.) But the April 2009 MRI reports disclosed that Middleton was experiencing "straightening of the normal lumbar lordosis," and lesions in the supralumbar spine and sacrum. (Id. at 259-61.) The reports also revealed "scattered Schmorl's nodes," "loss of signal within the disc spaces through the lumbar spine," loss of disc height especially at L2-L3, a disc bulge at L4-L5, "persistent facet arthropathy and ligamentum flavum thickening" at L5-S1, and mild central canal and bilateral recess narrowing. (Id. at 273, 480-81.) Regarding Middleton's bilateral hip pain, a January 2011 MRI report showed that she has

"tears in her hamstring muscles in both legs (back of her thighs)," which Dr. Hurley acknowledged can cause pain. (Id. at 479, 482.) An August 2011 x-ray report disclosed "moderate degenerative changes" in the lumbar spine despite its normal alignment and "significantly limited" flexion movement of the lumbar region. (Id. at 475.)

In March 2009 Middleton went to an ER complaining of sudden neck pain, right arm numbness, lower back pain, and right leg pain. (Id. at 302.) Dr. Hurley prescribed "narcotic, NSAID, and muscle relaxer" and recommended that she be temporarily restricted from working until further re-evaluation. (Id. at 301-02.) On April 16, 2009, Dr. Hurley indicated that Middleton tested positive for pain on the right side during the FABER test and straight leg raise test. (Id. at 292-94.) Having also looked at the MRI and CT scans of the cervical and lumbosacral spine, Dr. Hurley determined facet arthrosis at C3-4, C4-5, C5-6, C6-7, L4-5, and L5-S1 as well as disc dehydration at L4-5 and L5-S1. He recommended specific assessment plans, including physical therapy for neck and lower back pain and electromyography ("EMG") for additional review. (Id. at 292-95.) Dr. Hurley again concluded that Middleton was "temporarily disabled pending completion of the recommended workup," cautioning Middleton from working until the following month's clinic visit and re-evaluation. (Id. at 294-95.)

Dr. Hurley's progress notes from July through September of 2009 show that Middleton underwent repeated evaluations and engaged in physical therapy to address her intermittent neck pain and constant back pain, as well as her frequent

numbness and tingling in the extremities and pain in the right thigh—symptoms which were diagnosed as sciatica and arthropathy. (Id. at 286-95.) During this period, Middleton had pain in the neck and lower back at the levels of four to five on a scale of ten on average and eight to nine at worst. (Id. at 286.)

Middleton returned to the ER on September 26, 2009, when she fell and suffered "severe neck pain." (Id. at 282-85.) She was treated at the ER and she then continued physical therapy and evaluations the following month for cervical stenosis. (Id. at 280-82, 285.) She expressed worsened pain in the neck—four out of ten on average and ten out of ten at worst. (Id. at 280-81, 285.) After Middleton went through three months of physical therapy, Dr. Hurley reviewed the updated images on January 14, 2010, and observed disc dehydration at L4-5, dehydration at L5-S1, and moderate facet arthrosis at L4-5 bilateral and L5-S1 bilateral, but found normal alignment of the lordotic curve, no disc herniation, stenosis, or nerve root compression. (Id. at 276.) Dr. Hurley recommended home exercise and a pain management program, and determined that Middleton needed "complete temporary disability." (Id.) He opined that further surgery in the neck was not reasonable, and for Middleton's "even more problematic" back, he suggested weight reduction or ESIs. (Id. at 277.) Dr. Hurley noted that recent MRIs showed a degenerated disc in the neck and arthritis of Middleton's "'facet joints' which may account for her chronic LBP [lower back pain]." (Id. at 272.) This further reinforced his recommendation that Middleton undergo a pain clinic evaluation for ESIs,

especially for her facet joints, but again he did not think surgery was an option because of her arthritic conditions. (Id.)

The record also shows that Middleton suffers from hypertension and glaucoma with a history of high blood pressure and family history of heart problems and diabetes. (Id. at 312.) On March 8, 2010, she was again brought to the ER after suddenly feeling pain in her upper back that radiated across her whole chest. (Id.) According to her, she felt pressure-like squeezing pain, and she felt dizzy as if she were going to pass out. (Id. at 312, 350.) Her treadmill nuclear stress test came back negative for ischemia. (Id. at 312, 350-52.) Despite the indications for precordial pain, the attending physicians, namely Drs. Seif Martini, Saima Haque, and Mazen Kawji, were doubtful of its cardiac etiology based on the electrocardiogram ("ECG"), nuclear stress test, acute myocardial infarction profile, and nuclear perfusion scan for ischemia and myocardial injury. (Id. at 314-17, 336, 359-60.) The report showed, however, that a number of ECG graphs produced "[a]bnormal ECG" signals. (Id. at 337-39.) Accordingly, Dr. Hurley placed Middleton's visit to a pain clinic on hold until further recovery for concern that though "she did not suffer a heart attack . . . [it] could be related to her spine." (Id. at 389, 485.)

Regarding Middleton's worsening back, hip, and leg problems, Dr. Hurley opined that he might suggest another surgery if not for her condition with facet joint arthritis. (Id. at 272, 465.) As an alternative measure, Middleton began to see pain specialists Dr. Faris Abusharif and Dr. Jose Penaherrera in April 2011. (Id. at

492-94.)  During this period, Middleton complained of low back pain which radiated to her neck, right leg, and thigh, and described it as aching, sharp pain—shooting and throbbing with the intensity of five to seven out of ten on the pain scale.  (Id.)  Symptoms also included numbness, pins and needles, tingling, and muscle spasms.  (Id.)  Leg swelling was also observed.  (Id. at 473-74.)  Middleton tested positive for "supine SLR," "painful lumbar muscles with flexion," "deep tendon reflex / nerve stretch" as well as "decreased temperature sensation and decreased to pin prick." (Id.)  Dr. Abusharif diagnosed Middleton with "lumbar disc protrusion with lumbar radiculopathy L5-S1 dermatomal distribution on the right side," recommending a set of "right L5 and S1 transforaminal [ESIs]."  (Id.)  Despite undergoing a series of ESIs for the lower back, however, Middleton continued to report persistent pain in the lower back, hips, and legs as well as stiff and aching neck.  (Id. at 478, 489.)  In June 2011, despite receiving several ESIs, Middleton reported that her low back pain was "moderate to severe sharp stabbing," and was aggravated by sitting, standing, and walking.  (Id.)  Dr. Sreepathy Kannan conducted a nerve conduction study in July 2011 but its result was limited because Middleton's legs were "severely swollen."  (Id.)

The record also includes the report of a consulting examining physician and residual functional capacity ("RFC") assessments completed by two consulting physicians.  In April 2010 Dr. Sarat Yalamanchili examined Middleton and reviewed her relevant medical history and evidence in the record.  He noted that Middleton had a stiff neck with limited ranges of motion and limited lumbar

motions evidenced by a positive lumbar straight leg raise test which was "impaired because of radicular pain." (Id. at 397-99.) But he also noted that she had a normal gait, normal handgrip, and normal muscle strength. (Id.) After the review, Dr. Yalamanchili opined that Middleton's "range of motion of cervical spine, lumbar spine was impaired." (Id. at 400.) He further opined that her neck pain was possibly related to her history of cervical fusion and that the lower back pain was possibly related to her history of degenerative disc disease. (Id.) In May 2010 Dr. Francis Vincent, an agency consulting physician, conducted an RFC assessment based on the relevant evidence available and determined that Middleton can occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for a total of about 6 hours, sit for a total of about 6 hours, push and/or pull without limitation, and occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Id. at 453-60.) In August 2010 Dr. Richard Bilinsky, another agency consulting physician, affirmed Dr. Vincent's conclusions with little explanation. (Id. at 461-63.) Middleton's treating neurosurgeon, Dr. Hurley, on the other hand, opined in December 2010 that given "her extensive surgical work to her spine and now with her persistent LBP I would agree that she is unable to [return to work] either full or part-time and I would support a claim of complete disability." (Id. at 483.)

## B. Middleton's Hearing Testimony

During her hearing before the ALJ, Middleton testified that she stopped working in late 2008 when she no longer was able to perform her duties as a retail customer representative. (A.R. 57, 65.) She testified that she had not worked since

December 2008 because of her lower back and neck issues, (id. at 57-58, 65), and because Dr. Hurley did not want her returning to work, (Id. at 65). Middleton testified that none of the surgeries or other treatments she had undergone had relieved her pain and that she has plans to meet with her neurosurgeon to determine whether another surgery was a viable option. (Id. at 58-59.)

In describing her daily activities, Middleton testified that she lives with her husband who works at home during the night, from 10:00 p.m. to 6:00 a.m., as a network server manager. (Id. at 59-60, 64.) Her husband helps take care of the cats because Middleton has problems bending to feed them. (Id. at 60.) He also helps with house chores including cooking, cleaning, and the laundry because she cannot bend over or stand for long. (Id. at 64.) She drives a car but only for about 10 to 15 minutes at a time, and never by herself because side effects of her pain medications include drowsiness. (Id. at 60-61.) She usually takes pain medications including Vicodin with codeine on a set schedule at night and also during the day if she needs it. (Id. at 62.) She also takes a "water pill" for her leg swelling condition. (Id. at 71.) Middleton's husband usually does the grocery shopping, and sometimes she goes with him to the store where she uses a shopping cart to help her walk. (Id. at 66.) She uses a computer but only for five to ten minutes at a time because she has trouble sitting for an extended period. (Id. at 65.) After using the computer she switches to a more comfortable chair such as her recliner to elevate her feet. (Id.) Middleton testified that if she walks, sits, or lies down for too long at a time, her pain would get worse. (Id. at 62.) Her legs would also swell and get very large. (Id.

at 62-63.)  To alleviate the condition, she keeps her legs elevated when sitting and wears compression stockings every day.  (Id.)

When asked to describe her pain, Middleton testified that her pain is located in the lower back and radiates down her right leg.  (Id. at 66.)  She explained that the pain is steady but that the intensity waxes and wanes.  (Id.)  She said weather also triggers the pain and makes it worse.  (Id. at 61, 66.)  She also has chest pain, which she described as a "squeezing feeling" in the chest with pain shooting down her left arm.  (Id. at 81.)  She has numbness in her right hand because of the neck surgery.  (Id. at 67.)  She said she can sit for 20 minutes to an hour depending on her erratic back condition and can walk for a block at a time unaided.  (Id.)  She can only stand for 10 minutes and was told by her neurosurgeon that she can lift no more than 20 pounds.  (Id.)

## C.    The ALJ's Decision

On October 31, 2011, the ALJ concluded that Middleton is not disabled under sections 216(i) and 223(d) of the Social Security Act.  (A.R. 29.)  In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), and at the first two steps of the framework she found that Middleton has not engaged in substantial gainful activity since December 26, 2008, and that she suffers from severe impairments in the form of status post cervical fusion, cervical stenosis with sciatica, degenerative disc disease of the lumbar spine, coronary artery disease, and obesity.  (Id. at 20.)  At step three the ALJ determined that none of Middleton's impairments are conclusively disabling because they do not meet or medically equal

a listing, either individually or in combination. (Id. at 20-21.) The ALJ specifically ruled out listing 1.04 for disorders of the spine and listing 4.04 for ischemic heart disease. (Id. at 21.) The ALJ also considered obesity per Social Security Ruling 02-1p. (Id.)

Next, the ALJ determined that Middleton retains the RFC to perform "light work" as defined in 20 C.F.R. § 404.1567(b), with the following limitations: occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; occasionally balance and stoop but never kneel, crouch, or crawl; and occasionally work around hazards such as dangerous moving machinery or unprotected heights. (Id. at 26.) In explaining her analysis, the ALJ reasoned that she found Middleton's allegations regarding her level of pain to be less than credible based on what she perceived as a lack of support in the objective record, general inconsistencies, and credibility issues. (Id. at 23-26.) In particular, the ALJ found Middleton's allegations not entirely credible because they were "inconsistent with her work history, course of treatment, examination findings, and prior statements." (Id. at 26.) As for the various medical opinions, the ALJ gave "minimal weight" to Dr. Hurley's opinions despite supporting diagnoses from Dr. Penaherrera, Dr. Koehler, and Dr. Abusharif, among others. (Id. at 27.) On the other hand, the ALJ placed "great weight" on the state agency consulting physicians' opinions. (Id. at 34.) Based on the consultants' RFC assessments, the ALJ concluded that Middleton is able to perform her past relevant work of convenience store manager and customer service worker as actually performed and generally performed in the

national economy, as well as other jobs available in the regional economy, such as cleaner or housekeeper, cashier, or information clerk. (Id. at 27-28.) Accordingly, the ALJ concluded that Middleton is not disabled. (Id. at 29.)

## Analysis

Middleton argues that the ALJ committed errors when finding that her allegations are not credible, when placing minimal weight on Dr. Hurley's opinions, and when determining her RFC. In particular, Middleton argues that the ALJ failed to adequately explain her credibility findings, improperly weighed the medical opinions, and failed to consider Middleton's impairments both individually and in combination. The government argues that the ALJ properly considered the medical evidence as a whole and asserts that substantial evidence supports her RFC analysis, including the credibility determination.

The court applies a deferential standard of review to the ALJ's decision, evaluating only whether that decision is free of legal error and supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation and citation omitted). In determining whether substantial evidence supports the ALJ's decision this court considers the record as a whole but neither substitutes its judgment for the ALJ's nor reweighs the evidence. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004). Despite this deferential standard, this court will not hesitate to reverse where the

ALJ failed to adequately discuss the issues or build a "logical bridge" between the evidence and her conclusions. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

## A.      Credibility Analysis

Middleton challenges the ALJ's credibility analysis, arguing that the ALJ failed to weigh required factors in discounting her testimony and gave unsupported reasons for finding her lacking in credibility. Middleton's challenge to the ALJ's credibility analysis presents a fairly close call. On the one hand, this court's review of the ALJ's credibility determination is particularly deferential, allowing reversal only where the analysis is "patently wrong." *See Schomas*, 732 F.3d at 708. On the other hand, a credibility determination will not stand where the only reasons supporting it are based on a misreading or mischaracterization of the record. *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) ("Reviewing courts . . . should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported."). In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, *see* 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, and justify the finding with specific reasons, *see Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir. 2002). Here, Middleton has shown that enough of the ALJ's reasons for discrediting her testimony are unsupported or unreasonable so as to warrant a remand for the ALJ to reassess her credibility.

In explaining her determination that Middleton is not credible, the ALJ wrote that her allegations "are inconsistent with her work history, course of treatment, examination findings, and prior statements." (A.R. 26.) She also added, "[t]he claimant has alleged a number of impairments that are not evidence[d] by the medical record." (Id.) For example, the ALJ discredited Middleton's complaint of "significant swelling of her legs" such that "she would have to wear compression socks and elevate her legs," writing that there is "no definite etiology" to explain such swelling. (Id.) The ALJ further explained that "the medical record demonstrates minimal evidence of symptoms or related limitations." (Id.) But contrary to that assertion, there are a number of records that acknowledged Middleton's swollen legs. In his progress note, Dr. Penaherrera observed lower extremity edema. (Id. at 465.) The record also shows that Middleton was prescribed "water pills" for her leg-swelling condition. (Id. at 71, 473-74.) Also, in July 2011 another doctor noted that her "legs were severely swollen" to such an extent that the swelling interfered with an EMG nerve conduction study. (Id. at 488.) As for the cited lack of clear etiology, such an absence does not necessarily undermine the symptom's severity, its impact on functionality, or the credibility of the purported allegations. *See Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009).

The ALJ also found Middleton's testimony regarding her extreme pain and physical limitations on sitting, standing, and walking not credible. In support of this finding, the ALJ explained that "recent medical records demonstrate conditions

generally within normal limits and routine treatment." (A.R. 26.) By way of example, the ALJ described Middleton's preventive treatment consisting of exercise and nutrition/weight program, benign uterine fibroids, "low-grade partial thickness" tears of the hamstring tendons, and concluded that "no further record of significant treatment or diagnosis" was found. (Id.) But "allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, 1996 WL 374186, at *6. The regulations explain that "[i]n general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements." SSR 96-7p, 1996 WL 374186, at *7. Also, "[p]ersistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms." *Id.*

Here, the ALJ's assertion that Middleton's medical records are essentially normal is difficult to square with the extensive evidence documenting her attempts to get medical relief for her back and neck pain. In particular, in March 2009

Middleton went to an ER because of sudden neck pain, right arm numbness, lower back pain and right leg pain. (A.R. 301-03.) Dr. Hurley prescribed her "narcotics, NSAID, and muscle relaxer" and recommended that she be temporarily restricted from working until further re-evaluation. (Id. at 301-02.) A month later, Middleton tested positive on the right side during the FABER and straight leg raise tests. (Id. at 292-93.) The imaging scans of Middleton's cervical and lumbosacral spine showed facet arthrosis and disc dehydration, for which physicians prescribed her various assessment plans including physical therapy. (Id. at 292-95.) Dr. Hurley again diagnosed Middleton as "temporarily disabled pending completion of the recommended workup," preventing her from working until the following month's clinic visit and re-evaluation. (Id. at 294-95.) Middleton's neck and back conditions worsened through 2010 with degenerated disc, disc dehydration, moderate facet arthrosis, and facet joints, among others. (Id. at 272, 276-79, 280-81, 285.) Middleton also demonstrated physical limitations including positive "supine SLR," "painful lumbar muscles with flexion," "deep tendon reflex/ nerve stretch," and "decreased temperature sensation and decreased to pin prick." (Id.) Because Dr. Hurley advised against another surgery, Middleton underwent a series of ESIs for her lower back in 2011 but found no pain relief. (Id. at 478, 489.) The ALJ failed to properly consider the relevant factors of Middleton's treatment history, how her treatments affected her alleged pain, and her persistent attempts to alleviate her pain. *See* SSR 96-7p, 1996 WL 374186; *see Kirsch v. Colvin*, No. 11 C 9199, 2014 WL 6091915, at *5 (N.D. Ill. Nov. 14, 2014).

Also, the ALJ pointed out an inconsistency, according to her, that Middleton "put a hold on her treatment, stating that she had suffered a heart attack," but wrote that "[t]he medical record demonstrate[d] no such heart attack." (A.R. 26-27.) The record shows that Middleton was brought to the ER for severe chest pain and dizziness, which later tested negative for ischemia but without identifying their origin. (Id. at 312.) Middleton later reported to Dr. Hurley that "her cardiologist told her . . . he believes she did not suffer a heart attack but wonders if her chest pain could be related to her spine." (Id. at 485.) Middleton also explained during the ALJ hearing that someone from the ER told her "it possibly could have been a small heart attack." (Id. at 81.) Moreover, it appears to be Dr. Hurley, not Middleton, who put the pain clinic treatments on hold for low back pain out of concern that though "she did not suffer a heart attack . . . [it] could be related to her spine." (Id. 389, 485.) The Seventh Circuit has explained that etiology of extreme pain often is unknown, so no one can infer from the inability of a physician to identify the cause of her pain that she is faking it. *Villano*, 556 F3d at 562-63. In light of Middleton's update of her condition to Dr. Hurley, explanations provided during the hearing, and the unclear etiology of the chest pains found in the record, the court finds the ALJ's inference unsupported.

However, the ALJ's discounting of Middleton's description of "right hand numbness due to the neck surgeries," has adequate support. She explained that there is "sparse documentation of such a problem" in the record and that Middleton "demonstrated normal grip strength bilaterally and normal ability to perform fine

19

and gross manipulation." (A.R. 26.) Despite a number of objective findings Middleton points out relating to a mild osteophyte protruding to the right paracentral region, mild degenerative change in the spine, (id. at 404), "mild" levels of degenerative change, osteophyte, indentation of the cervical cord, and central canal narrowing, (id. at 258, 299, 403-04, 415.), it is not clear that any of the proffered evidence supports a finding of hand numbness. The ALJ provided a logical connection between the findings of normal grip strength and gross manipulation and her conclusion regarding the right hand numbness.

Although this court's review of a credibility determination is necessarily deferential, *see Jones*, 623 F.3d at 1160, and not all of the ALJ's reasons have to be fully supported, *see Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009), here the holes in the ALJ's assessment are significant enough to destroy the logical bridge between the evidence and her explanation. Accordingly, the court concludes that on remand the ALJ must reassess Middleton's credibility and consider how it might affect her weighing of medical opinions and her RFC determination.

## B.    Weighing of Medical Opinions

Next, Middleton challenges the ALJ's decision to afford "minimal" weight to the opinion of Middleton's neurosurgeon, Dr. Hurley, and argues that the ALJ neglected to consider all the relevant evidence of record. In particular, she challenges the ALJ's decision to give "great weight" to the opinions of agency physicians Dr. Vincent and Dr. Bilinsky, neither of whom ever examined Middleton, while discounting the opinions of her treating physicians. (A.R. 453-63.) A treating

physician's medical opinion is entitled to controlling weight if it is well supported and "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Even if the treating physician's opinions are not entitled to controlling weight, they may be due substantial weight depending on how the ALJ weighs a number of regulatory factors, including the longevity and frequency of the treating relationship, and the supportability and consistency of the physician's opinions. *See* 20 C.F.R. § 404.1527(c)(2). An ALJ is entitled to discount a treating source's opinion if it is either unsupported by medically acceptable diagnostic techniques or is inconsistent with other substantial evidence. *Id.*; *see also Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). These factors are designed to strike a balance between the benefit that derives from a treating physician's ability to observe a claimant over an extended period and the danger that the same physician will be too quick to find disability out of loyalty to, or sympathy for, the patient. *See Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011).

Here, because there are differences of opinion between the treating neurosurgeon, Dr. Hurley, and the agency consultants, (id. at 453-63, 483-84), Dr. Hurley's opinions are not entitled to controlling weight, *see Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). But before discounting Dr. Hurley's opinions, the ALJ was required to consider the length of his treating relationship, the frequency of examination, his specialization, and whether his opinions are supported by and consistent with the record as a whole. *See* 20 C.F.R. § 404.1527(c); *Moss v. Astrue*,

555 F.3d 556, 561 (7th Cir. 2009). Dr. Hurley performed two fusion surgeries, evaluated Middleton's progress, prescribed medications, made a referral to a pain clinic, collaborated with physicians of different expertise, and provided medical assessments and plans since 2004. (A.R. 192, 258-60, 276-77, 376, 394-97, 436-39.) Based on this treating relationship, he opined that Middleton's persistent low back pain rendered her unable to work. (Id. at 483.) Absent from the ALJ's decision to give this opinion minimal weight, however, is any discussion of the length and frequency of his treating relationship with Middleton, his specialization as a neurosurgeon, or his knowledge of Middleton's impairments. *See* 20 C.F.R. § 404.1527(c). That absence is particularly concerning because Dr. Hurley is a specialist in neurosurgery who treated Middleton over a number of years, including performing the two cervical fusion surgeries for the very conditions Middleton claims are disabling her. (A.R. 192, 258-60, 276-77, 376, 394-97, 436-39.) Dr. Hurley regularly evaluated, diagnosed, and recommended plans of treatment and therapy for Middleton, especially in the years 2004-2005 and 2009-2010. (Id. at 272-303, 427-51.) Had she considered these factors explicitly, the ALJ might have concluded that Dr. Hurley's medical opinion was entitled to more than the "minimal weight" she assigned it. (Id. at 34.)

Instead of analyzing Dr. Hurley's opinion in the context of the required factors, the ALJ perfunctorily wrote that Dr. Hurley's assessment that Middleton was "unable to return to work either full or part-time" "due to the claimant's extensive surgical work to her cervical spine and her persistent low back pain" was

"conclusory and poorly supported" as well as "inconsistent" with the medical record." (Id. at 27.) Although a physician's opinion regarding the claimant's ability to work is not entitled to any "special significance," the ALJ is required to consider it and to review all of the medical findings or other evidence supporting the physician's opinion. 20 C.F.R. § 404.1527(d)(1), (3); *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013). The ALJ does not make clear in her decision whether she at least considered Dr. Hurley's opinion in view of all the medical findings, other physicians' opinions, and other evidence supporting his opinion. Nor does she explain why Dr. Hurley's finding that Middleton's back impairments limit her ability to work is inconsistent with the extensive record of interventions she underwent in an attempt to relieve her back pain. For example, Dr. Hurley examined Middleton and observed disc-related issues including osteophyte complex with mild indentation of the cervical cord and moderate neuroforaminal narrowing in her neck, (A.R. 258, 415-16), lumbar disc degeneration, Schmorl's nodes, moderate arthropathy and hypertrophy, uterine fibroids, and hamstring tears in her hips and lower back, (id. at 259-61, 273, 479-82). Dr. Hurley then prescribed narcotic pain medications and referred Middleton to Dr. Abusharif for ESIs for additional pain relief. (Id. at 62, 272, 290, 447, 493-94.) Dr. Hurley's evaluations and treatments were not only based on Middleton's self-reports but also based on the diagnosis made by Drs. Penaherrera, Koehler, Abusharif, Haque, Kawji, among others. The ALJ's cursory and blanket assertion about Dr. Hurley's opinion lacks record support.

The government defends the ALJ's treatment of Dr. Hurley's opinion by arguing that she was not required to give an exhaustive factor-by-factor analysis. True enough, but the ALJ must explain the weight given to the treating physician's opinion with enough specificity "to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). She fails to do so here. Accordingly, there is no logical bridge between the evidence and the ALJ's determination that Dr. Hurley's opinion is entitled to only minimal weight. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

Moreover, Middleton points out that the agency consulting physicians, Drs. Vincent and Bilinsky, on whose opinions the ALJ placed "great weight," provided their opinions in May and August of 2010—12 to 15 months before the ALJ's hearing and decision. (R. 22, Pl. Mem. at 10.) Middleton argues that the consulting physicians did not have the opportunity to review up-to-date medical records generated during the 12 to 15 months leading up to the ALJ's decision. The relevant records include pain specialist Dr. Abusharif's ESI treatments and assessments, Dr. Kannan's EMG report regarding nerve conduction study and severe swollen legs, Dr. Deutsch's reports concerning rhizotomy or facet injections, and Drs. Hurley, Penaherrera, and Koehler's updated progress notes. (A.R. at 460-63, 495-502.) As Middleton asserts, the consulting physicians did not have the benefit of reviewing all treatment records and it is not unreasonable to believe that

the updated information may have affected their opinions. Although an ALJ may give weight to consultative opinions, here, the ALJ did not adequately explain why the reviewers' opinions were entitled to greater weight than those of the treating physicians. *See Campbell v. Astrue*, 627 F.3d 299, 309 (7th Cir. 2010). Given the deficiencies in the ALJ's reasoning, the ALJ should elaborate on her conclusions on remand.

## C.     Combined Effect of Impairments

Because the court remands the ALJ's findings on Middleton's credibility and the weighing of medical opinions, and an RFC determination is largely dependent on those findings, the issue raised by Middleton regarding the RFC determination will be addressed briefly. Middleton argues that the ALJ's discussion of her combination of impairments was inadequate. Specifically, Middleton contends that the ALJ addressed the impairments individually but failed to consider the cumulative effects of all relevant impairments, including Middleton's chronic neck pain, lower back pain, leg pain, chest pain, leg swelling, pain radiating to her extremities, and obesity. When a claimant alleges a number of impairments, the ALJ must consider "the *aggregate* effects of the entire constellation of impairments." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (emphasis in original). It is well established in the Seventh Circuit that an ALJ needs to consider the applicant's medical situation as a whole. *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) (citations omitted). "Even if each problem assessed separately were

less serious than the evidence indicates, the combination of them might well be totally disabling." *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011).

Here, Middleton offers no guidance to the court about how her impairments ought to have been considered "in combination" other than to merely state that "the ALJ failed to address [Middleton's] impairments in combination" and that "the ALJ sprinkled the words 'in combination' liberally throughout her opinion." (R. 33, Pl.'s Reply at 9.) Middleton enumerates her individual impairments and argues that their cumulative effects were not adequately explained by the ALJ. (R. 22, Pl. at 13-14.) But the burden lies with Middleton to demonstrate her disability. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) ("The claimant bears the burden of producing medical evidence that supports her claims of disability."). In the absence of any specificity, legal citations, or evidence, Middleton makes only an underdeveloped argument, which is inadequate to overturn the decision of the ALJ. *See Hunt v. Astrue*, No. 10 CV 2874, 2012 WL 1044744, at *8 (N.D. Ill. Mar. 26, 2012).

But even if Middleton had developed this argument, it also fails on the merits because the ALJ reviewed Middleton's impairments, "individually or in combination," at step two and gave "careful consideration of the entire record" by "consider[ing] all symptoms" at step four, before concluding that Middleton was not disabled. (A.R. 21-22.) The ALJ's review of impairments is further evidenced by

her discussion that "the stress to [Middleton's] spine secondary to her weight might be a factor of the lower back degeneration[,]" (id. at 26), and that Middleton does not "manifest clinical signs and findings that meet the specific criteria of any of the listings, even after giving consideration to the claimant's obesity[,]" (id. at 21). The government also cites to legal authority which explains that "[t]he presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926). The court agrees with the proposition that the ALJ deserves due deference on her factual determinations. In light of the record, the court finds sufficient evidence to show that the ALJ accounted for all of Middleton's symptoms in the aggregate. *See Lott v. Colvin*, 541 Fed. App'x. 702, 706 (7th Cir. 2013) (noting that "we only require that the ALJ acknowledge having considered the aggregate effect, as long as the ALJ discusses each symptom"). But because the court remands the case for issues relating to Middleton's credibility and weighing of medical opinions, the ALJ should again consider the cumulative effects of Middleton's impairments on remand and discuss their impact, along with her renewed assessment of Middleton's credibility and medical opinions, on her RFC determination.

## Conclusion

For the foregoing reasons, Middleton's motion is granted, the Commissioner's motion is denied, and the case is remanded for further proceedings.

**ENTER:**

**Young B. Kim**
**United States Magistrate Judge**